Submitted by Counsel

*Ulysses J. Ware* (signature)

Ulysses Thomas Ware
Reg. No. 56218-019
Atlanta Prison Camp
P.O. Box 150160
Atlanta, GA 30315
12/12/2012 05:22:22 P.M. printed





FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

DEC 19 2012

JAMES N. HATTEN, CLERK
By: _____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ULYSSES THOMAS WARE, <br>     PETITIONER, <br><br> VS. <br><br> WARDEN DARLEEN DREW, <br> BUREAU OF PRISONS, <br> ATLANTA PRISON CAMP. <br>     RESPONDENTS. | CASE #: 12-CV- <br> **1:12-CV-4397** |

EMERGENCY PETITION FOR IMMEDIATE RELEASE
28 USC §2241: PETITION FOR A WRIT OF HABEAS CORPUS
ACTUAL AND FACTUAL INNOCENCE OF ALL CHARGES

Appendix I to 12/12/2012 Declaration of Material Fact

Pages 48 – 78

9

12/13/2012

that time. The title of the lawsuit was <u>Alpha Capital</u>
<u>Aktiengesellschaft, Amro International, S.A., Markham Holdings,</u>
<u>Ltd., and Stonestreet Limited Partnership</u> v. <u>Group Management</u>
<u>Corp., Thomas Ware, Len Churn and Barry Corker</u>, 02 Civ. 2219
(LBS) (the "Civil Action"). The Civil Action was filed in the
United States District Court for the Southern District of New
York and was assigned to United States District Judge Leonard B.
Sand (the "Court").

9.    The Civil Action involved loan agreements entered into
by each of the Civil Plaintiffs and Internet Venture Group, Inc.
in or around February 2001 (the "Loan Agreements") under which
Internet Venture Group, Inc. borrowed a total of approximately
$1.1 million collectively from the Civil Plaintiffs. These Loan
Agreements were essentially identical except for the amount of
loan principal. They provided for the Civil Plaintiffs to
purchase convertible notes from Internet Venture Group, Inc.,
which were due on January 1, 2003, absent a default by Internet
Venture Group, Inc., in which case the maturity date of the notes
would be accelerated. Each Loan Agreement consisted of a
convertible note, a subscription agreement, and, beginning in or
around September 2001, a security agreement.

10.   Among other things, the Loan Agreements obligated
Internet Venture Group, Inc. to convert, upon the request of a
Civil Plaintiff, a certain portion of the loan principal or

3

interest into common stock of Internet Venture Group, Inc. (hereinafter a "Conversion Request"). The number of shares that Internet Venture Group, Inc. was obligated to convert upon a Conversion Request would be determined in part by the stock's prevailing market price. The Loan Agreements provided that Internet Venture Group, Inc. could not refuse to honor Conversion Requests without first obtaining an order from a court and posting a bond for 130 percent of the loan amount.

11. On or about August 17, 2001, Internet Venture Group, Inc. changed its name to Group Management Corporation ("GMC").

12. In or around February 2002, the Civil Plaintiffs declared GMC in default of the Loan Agreements based on GMC's failure to fulfill certain of its obligations under the Loan Agreements related to having the stock underlying the Loan Agreements registered with the United States Securities and Exchange Commission. In addition, in or around February 2002, Alpha Capital Aktiengesellschaft submitted a Conversion Request to GMC which GMC failed to honor.

13. In or about March 2002, the Civil Plaintiffs filed the Civil Action seeking, among other things, an injunction directing GMC to honor all Conversion Requests. On or about April 29, 2002, the Court entered a written order directing GMC to honor outstanding Conversion Requests.

4

14. On November 25, 2002, the Court granted summary judgment by default against GMC. Among other things, the Court observed GMC's "repeated and willful violations of the Court's order" of April 29, 2002 directing GMC to honor Conversion Requests.

15. By written order dated November 25, 2002, the Court, among other things, directed GMC and "its officers, agents, servants, employees and attorneys and all those in active concert with them . . . [to] continue to honor all conversion requests in accordance with the terms and conditions of the agreements between the parties and deliver all opinions and other documents necessary for Plaintiffs to sell shares received upon conversion . . . ." The Court mailed a copy of its November 25, 2002 order and decision to GMC.

16. In or around January 2003, the Internet web site maintained by the U.S. Securities and Exchange Commission indicated that THOMAS WARE, a/k/a "Ulysses Thomas Ware," the defendant, was the acting chief executive of GMC. On or about January 23, 2003, after seeing this information, an attorney for the Civil Plaintiffs mailed a copy of the Court's November 25, 2002 order directly to WARE. WARE later acknowledged receipt of it to the attorney for the Civil Plaintiffs.

17. On or about January 24, 2003, the Civil Plaintiffs submitted Conversion Requests to GMC. THOMAS WARE, a/k/a

5

"Ulysses Thomas Ware," the defendant, responded on behalf of GMC and declined to honor the Conversion Requests, taking positions that had previously been rejected by the Court.

18. On or about March 13, 2003, the Court entered a written order holding GMC and THOMAS WARE, a/k/a "Ulysses Thomas Ware," the defendant, in contempt of court for failing to comply with the Court's November 25, 2002 order to honor Conversion Requests. The Court further directed GMC and WARE to honor Conversion Requests within three days of the mailing of the Court's order. On or about March 17, 2003 and March 28, 2003, the Court ordered the arrest of WARE.

19. In or around June 2003, GMC honored Conversion Requests from January 2003.

20. In or around June and July 2003, three of the Civil Plaintiffs submitted additional Conversion Requests to GMC. GMC did not honor these Conversion Requests.

21. On or about August 13, 2003, the Court entered a written order directing GMC to honor outstanding Conversion Requests from Alpha Capital Aktiengesellschaft. On or about August 23, 2003, the Court entered a written order holding GMC and THOMAS WARE, a/k/a "Ulysses Thomas Ware," the defendant, in contempt of court for failing to honor certain Conversion Requests and ordered the arrest of WARE. In or around September 2003, WARE sent to the Court a document indicating that he was

6

appealing the Court's orders of August 13, 2003 and August 23, 2003.

22.  On or about August 25, 2003, THOMAS WARE, a/k/a "Ulysses Thomas Ware," the defendant, advised the Court in writing that effective August 22, 2003, a company called Nubia2000.com, Inc. had acquired all of GMC's assets. WARE further told the Court that Nubia2000.com, Inc. had filed a petition for liquidation in the United States Bankruptcy Court. WARE further told the Court that GMC had been dissolved and ceased to exist. Attached to WARE's letter to the Court was a form filed with the United States Securities and Exchange Commission indicating that GMC had been succeeded as of August 22, 2003 by an entity named Silver Screen Studios, Inc.

(23.) On or about December 4, 2003, THOMAS WARE, a/k/a "Ulysses Thomas Ware," the defendant, advised the Court in writing that GMC and an entity named SSSG Acquisition Corp. had filed petitions for liquidation in the United States Bankruptcy Court.

24.  On or about September 11, 2003, THOMAS WARE, a/k/a "Ulysses Thomas Ware," the defendant, requested and received formal authorization from the Court to appear as counsel of record for GMC in the Civil Action.

7

25. THOMAS WARE, a/k/a "Ulysses Thomas Ware," the defendant, and GMC have continued to fail to honor Conversion Requests that have been outstanding since at least August 2003.

## The Criminal Referral

(26) On or about December 22, 2003, the Court issued a written order in the Civil Action that, among other things, reconfirmed the Court's August 23, 2003 order to the extent of holding GMC and THOMAS WARE, a/k/a "Ulysses Thomas Ware," the defendant, in civil contempt of its November 25, 2002 order and "based upon their willful and continuing disobedience of this Court's orders," referred the matter to the United States Attorney's Office for the Southern District of New York for prosecution of criminal contempt against, among others, WARE.

## STATUTORY ALLEGATION

27. From at least in or around January 2003 through and including on or about the date of the filing of this Indictment, in the Southern District of New York and elsewhere, THOMAS WARE, a/k/a "Ulysses Thomas Ware," the defendant, together with others known and unknown, unlawfully, willfully, and knowingly, did disobey and resist a lawful writ, process, order, rule, decree, and command by a court of the United States, to wit, WARE disobeyed an order of the United States District Court for the Southern District of New York that was entered on or about November 25, 2002 in Alpha Capital Aktiengesellschaft, Amro

8

International, S.A., Markham Holdings, Ltd., and Stonestreet Limited Partnership v. Group Management Corp., Thomas Ware, Len Churn and Barry Corker, 02 Civ. 2219 (LBS), ordering GMC and its officers, agents, servants, employees, and attorneys and all those in active concert with them to honor all Conversion Requests submitted by the Civil Plaintiffs.

(Title 18, United States Code, Section 401(3).).

### COUNT TWO
### (Criminal Contempt)

The Grand Jury further charges:

28. The allegations set forth in paragraphs 1 through 26 are repeated, realleged, and incorporated as if set forth fully herein.

29. From in or around March 2003 to in or around June 2003, in the Southern District of New York and elsewhere, THOMAS WARE, a/k/a "Ulysses Thomas Ware," the defendant, together with others known and unknown, unlawfully, willfully, and knowingly, did disobey and resist a lawful writ, process, order, rule, decree, and command by a court of the United States, to wit, WARE disobeyed an order of the United States District Court for the Southern District of New York that was entered on or about March 13, 2003 in Alpha Capital Aktiengesellschaft, Amro International, S.A., Markham Holdings, Ltd., and Stonestreet Limited Partnership v. Group Management Corp., Thomas Ware, Len Churn and Barry Corker, 02 Civ. 2219 (LBS), ordering GMC and THOMAS WARE, a/k/a

9

"Ulysses Thomas Ware," the defendant, to honor Conversion Requests submitted by the Civil Plaintiffs.

(Title 18, United States Code, Section 401(3).).

## COUNT THREE
### (Criminal Contempt)

The Grand Jury further charges:

30. The allegations set forth in paragraphs 1 through 29 are repeated, realleged, and incorporated as if set forth fully herein.

31. From in or around August 2003, up to and including the date of the filing of this Indictment, in the Southern District of New York and elsewhere, THOMAS WARE, a/k/a "Ulysses Thomas Ware," the defendant, together with others known and unknown, unlawfully, willfully, and knowingly, did disobey and resist a lawful writ, process, order, rule, decree, and command by a court of the United States, to wit, WARE disobeyed an order of the United States District Court for the Southern District of New York that was entered on or about August 13, 2003 in Alpha Capital Aktiengesellschaft, Amro International, S.A., Markham Holdings, Ltd., and Stonestreet Limited Partnership v. Group Management Corp., Thomas Ware, Len Churn and Barry Corker, 02 Civ. 2219 (LBS), ordering GMC to honor Conversion Requests

10

submitted by the Civil Plaintiffs.

(Title 18, United States Code, Section 401(3).).

FOREPERSON

DAVID N. KELLEY
United States Attorney

11

# U.S. District Court
# United States District Court for the Southern District of New York (Foley Square)
# CRIMINAL DOCKET FOR CASE #: 1:04-cr-01224-RWS-1

Case title: USA v. Ware

Date Filed: 11/17/2004
Date Terminated: 02/02/2009

Assigned to: Judge Robert W. Sweet

### Defendant (1)

**Thomas Ware**
*TERMINATED: 02/02/2009*
*also known as*
Ulyssess Thomas Ware
*TERMINATED: 02/02/2009*

represented by **Edward T.M. Garland**
Garland, Samuel & Loeb, P.C.
3151 Maple Drive N.E.
Atlanta , GA 30305
(404)262-2225
*TERMINATED: 03/19/2007*
*LEAD ATTORNEY*
*Designation: Retained*

**James Michael Roth**
Hurwitz Stampur & Roth (NY)
299 Broadway, Suite 800
New York , NY 10007
(212) 619-4240
Fax: (212) 619-6743
Email: jamesrothesq@gmail.com
*TERMINATED: 12/11/2008*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Lisa Scolari**
Law Office of Lisa Scolari
20 Vesey Street Suite 400
New York , NY 10007
212-227-8899
Fax: 212-964-2926
Email: LScolarilaw@earthlink.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Manubir S. Arora**

Garland, Samuel & Loeb, P.C.
3151 Maple Drive N.E.
Atlanta , GA 30305
(404) 262-2225
*TERMINATED: 03/19/2007*
*LEAD ATTORNEY*
*Designation: Retained*

**Nancy Lee Ennis**
Quijano & Ennis, P.C. (381 Park Ave.
S.)
381 Park Avenue South, Suite 701
New York , NY 10016
212 686 0666
Fax: (212) 686-8690
Email: nancyennis@qandelaw.com
*TERMINATED: 10/22/2007*
*LEAD ATTORNEY*

**Thomas Ware**
6050 Peachtree Parkway
Suite 240-234
Norcross , GA 30092
678-362-0226
*LEAD ATTORNEY*
*Designation: Waived or Self (Pro Se)*

**Pending Counts**

CRIMINAL CONTEMPT
(1-3)

**Disposition**

Imprisonment: 97 months; Supervised
Release: 3 Years

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**

None

**Disposition**

**Highest Offense Level (Terminated)**

None

**Complaints**

None

**Disposition**

**Plaintiff**

**USA**                                        represented by **Maria Elena Douvas**
U.S. Attorney's Office, SDNY (St
Andw's)
One St. Andrew's Plaza
New York , NY 10007
212-637-2327
Fax: 212-637-2527
Email: maria.douvas@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicholas Stoloff Goldin**
U.S. Attorney's Office, SDNY (St
Andw's)
One St. Andrew's Plaza
New York , NY 10007
212 637 2334
Fax: 212 637 2527
Email: nicholas.s.goldin@usdoj.gov
*LEAD ATTORNEY*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/17/2004 | 1 | INDICTMENT FILED as to Thomas Ware (1) count(s) 1-3. (Attachments: # 1) (kwi, ) (Entered: 12/16/2004) |
| 12/08/2004 | 2 | Order to Unseal Indictment as to Thomas Ware.. (Signed by Judge Douglas F. Eaton on 12/8/04) (Attachments: # 1)(kwi, ) (Entered: 12/16/2004) |
| 12/08/2004 | | Case Designated ECF as to Thomas Ware .(kwi, ) (Entered: 12/16/2004) |
| 03/02/2005 | 3 | Rule 5(c)(3) Documents Received as to Thomas Ware from the U.S.D.C. Northern District of Georgia (Atlanta, Georgia), their case no. 1:05-mj-116. Documents regarding Rule 40 proceedings. (bw, ) (Entered: 03/03/2005) |
| 03/14/2005 | 4 | Application for Admission Pro Hac Vice filed by Attorney Manubir S. Arora (Georgia State Bar No. 061641) as to defendant Thomas Ware. (bw, ) Additional attachment(s) added on 3/22/2005 (ph, ). (Entered: 03/15/2005) |
| 03/14/2005 | 5 | NOTICE OF ATTORNEY APPEARANCE: Manubir S. Arora appearing for Thomas Ware. (jp, ) (Entered: 03/18/2005) |
| 03/14/2005 | | Minute Entry for proceedings held before Judge Theodore H. Katz :Appearance as to Thomas Ware held on 3/14/2005. Deft Present w/ Atty Arora. AUSA Rick Goldin present. Deft pleads not guilty. Time excluded until 3/22/2005. (jp, ) (Entered: 03/23/2005) |
| 03/14/2005 | | Minute Entry for proceedings held before Judge Theodore H. Katz : Plea entered by Thomas Ware (1) Count 1-3 Not Guilty. (jp, ) (Entered: 03/23/2005) |

| 03/22/2005 | 6 | MEMO ENDORSEMENT on Motion Requesting defendant be excused from attending pre-trial conference as to Thomas Ware a/k/a Ulysses Thomas Ware. Judge memo-endorsed: So ordered. (Signed by Judge Robert W. Sweet on 3/21/05)(ph, ) (Entered: 03/22/2005) |
|---|---|---|
| 03/22/2005 | | Minute Entry for proceedings held before Judge Robert W. Sweet :Pretrial Conference as to Thomas Ware held on 3/22/2005, as to Thomas Ware; Pretrial Conference set for 6/7/2005 11:00 AM before Judge Robert W. Sweet. Next PTC scheduled for 6/7/05 at 11am. Time stopped 3/22/05 to 6/7/05 in interest of justice. (jw, ) (Entered: 03/24/2005) |
| 05/23/2005 | 7 | ENDORSED LETTER as to Thomas Ware addressed to Judge Sweet from Attorney Manubir S. Arora dated 5/23/05 re: requesting that the Court continue the pre-trial conference currently set for 6/7/05 at 11:00 a.m. for an additional 45-60 days. Judge memo-endorsed: This request is granted and Speedy Trial time is excluded to the next conference date on August 9, 2005 in the interest of justice. SO ORDERED. (Signed by Judge Robert W. Sweet on 5/23/05)(ph, ) (Entered: 05/24/2005) |
| 08/11/2005 | 8 | ENDORSED LETTER as to Thomas Ware addressed to Judge Sweet from Manubir S. Arora dated 8/3/05 re: requesting that the Court continue the pre-trial conference currently set for 8/9/05 at 10:30 a.m. until 9/26/05 at 2:00 p.m. Judge memo-endorsed: So ordered. (Signed by Judge Robert W. Sweet on 8/10/05)(ph, ) (Entered: 08/12/2005) |
| 08/11/2005 | | Set/Reset Hearings as to Thomas Ware: Pretrial Conference set for 9/26/2005 02:00 PM before Judge Robert W. Sweet.(ph, ) (Entered: 08/12/2005) |
| 09/06/2005 | 9 | ENDORSED LETTER as to Thomas Ware addressed to Judge Sweet from Nicholas S. Goldin, AUSA dated 8/24/05 re: Govt. requests the time for speedy trial purposes be excluded from 8/24/05 until 9/24/05.So Ordered. (Signed by Judge Robert W. Sweet on 8/31/05)(pr, ) (Entered: 09/07/2005) |
| 10/03/2005 | 10 | ENDORSED LETTER as to Thomas Ware addressed to Judge Sweet from Manubir S. Arora dated 9/30/05 re: Adjournment of the 9/26/05 PTC to 10/26/05 @ 2 PM and an exclusion of time.So Ordered. (Signed by Judge Robert W. Sweet on 10/3/05)(pr, ) Additional attachment(s) added on 10/4/2005 (pr, ). (Entered: 10/04/2005) |
| 10/03/2005 | | Set/Reset Hearings as to Thomas Ware: Pretrial Conference adjourned to 10/26/2005 02:00 PM before Judge Robert W. Sweet..(pr, ) (Entered: 10/04/2005) |
| 10/13/2005 | | Minute Entry for proceedings held before Judge Robert W. Sweet :Status Conference as to Thomas Ware held on 10/13/2005, as to Thomas Ware Status Conference set for 10/26/2005 04:30 PM before Judge Robert W. Sweet. Parties are notified. Deft. cont'd detained. (ae, ) (Entered: 10/28/2005) |
| 10/31/2005 | 11 | ENDORSED LETTER as to Thomas Ware addressed to Judge Sweet from Nicholas S. Goldin, AUSA dated 10/26/05 re: Requests that the court exclude time for speedy trial purposes from today until 11/22/05,. So Ordered. (Signed by Judge Robert W. Sweet on 10/27/05)(pr, ) (Entered: 11/01/2005) |

| 11/22/2005 | 12 | ENDORSED LETTER as to Thomas Ware addressed to Judge Sweet from Nicholas S. Goldin, AUSA dated 11/21/05 re: Exclusion of time from today to 1/23/06.So Ordered (Signed by Judge Robert W. Sweet on 11/22/05)(pr, ) (Entered: 11/23/2005) |
| --- | --- | --- |
| 11/30/2005 | 13 | ENDORSED LETTER as to Thomas Ware addressed to Judge Sweet from Nicholas S. Goldin, AUSA dated 11/21/05 re: Govt. requests the court exclude time for speedy trial purposes from today until 1/23/06.So Ordered. (Signed by Judge Robert W. Sweet on 11/22/05)(pr, ) (Entered: 12/01/2005) |
| 12/01/2005 |  | ***REJECTION OF ATTEMPTED PAPER FILING IN ECF CASE. The following document(s) Motion to Withdraw by Adam G. Province, as to Thomas Ware, was rejected by the Clerk's Office and must be FILED ELECTRONICALLY on the Court's ECF System. (rdz, ) (Entered: 12/01/2005) |
| 01/18/2006 | 14 | MOTION for Edward T.M. Garland to Appear Pro Hac Vice.Document filed by Thomas Ware. (jw, ) Additional attachment(s) added on 1/20/2006 (jw, ). (Entered: 01/19/2006) |
| 01/23/2006 | 15 | ENDORSED LETTER as to Thomas Ware addressed to Judge Sweet from Nicholas S. Goldin, AUSA dated 1/22/06 re: Exclusion of time from 1/23/06.So Ordered. (Signed by Judge Robert W. Sweet on 1/23/06)(pr, ) (Entered: 01/24/2006) |
| 01/23/2006 |  | Minute Entry for proceedings held before Judge Robert W. Sweet :Status Conference as to Thomas Ware held on 1/23/2006, as to Thomas Ware; Status Conference set for 4/24/2006 02:00 PM before Judge Robert W. Sweet. The status conference set for 1/23/06 at 2pm is adjourned to 4/24/06 at 2pm on the letter appliction filed by the Gov't. Parties are notified of time and date. Deft Ware cont'd on bail as previously set. (jw, ) (Entered: 01/26/2006) |
| 01/26/2006 | 16 | ORDER granting 14 Motion for Edward T.M. Garland to Appear Pro Hac Vice as to Thomas Ware (1)(Signed by Judge Robert W. Sweet on 1/25/06) (pr, ) (Entered: 01/27/2006) |
| 02/23/2006 |  | CASHIERS OFFICE REMARK as to Thomas Ware on 16 Order on Motion to Appear Pro Hac Vice in the amount of $25.00, paid on 2/7/2006, Receipt Number 569534. (jd, ) (Entered: 02/23/2006) |
| 04/19/2006 | 17 | ENDORSED LETTER as to Thomas Ware addressed to Judge Sweet from Attorney David B. Levitt dated 4/18/06 re: submitted to request that the Pretrial Conference, currently scheduled for 4/24/06, be reset in the latter part of June. If the Court grants this request, defense counsel further requests that the Court endorse this letter as an Order excluding the time between 4/24/06, and the next conference date in the interests of justice pursuant to Title 18 USC Section 3161(h)(8)(A). Judge So Ordered this 19 day of April, 2006. (Signed by Judge Robert W. Sweet on 4/19/06)(bw, ) (Entered: 04/19/2006) |
| 06/15/2006 | 18 | ENDORSED LETTER as to Thomas Ware addressed to Judge Sweet from Attorney David B. Levitt dated 6/9/06 re: submitted to request a continuance of the Pre-Trial Conference currently set for 6/12/06. Judge Endorsed - The |

| | | |
|---|---|---|
| | | conference will be adjourned to September 21, 2006 at 4:30 with the oral consents of the parties. The time for speedy trial calculation from June 6 to September 21 will be excluded. (Signed by Judge Robert W. Sweet on 6/12/06)(bw, ) (Entered: 06/16/2006) |
| 06/15/2006 | | Set/Reset Hearings as to Thomas Ware: Pretrial Conference set for 9/21/2006 04:30 PM before Judge Robert W. Sweet.(bw, ) (Entered: 06/16/2006) |
| 09/22/2006 | 19 | ENDORSED LETTER as to Thomas Ware, addressed to Judge Sweet, from David B. Levitt, Atty for dft, dated 9/22/06, re: request that the Court set a trial date in December, 2006.... If the Crt grants this request, we further request that the court endorse this letter as an order excluding the time between 9/22/06 and the trial date set by Your Honor in the interest of justice. -- Judge endorsed: SO ORDERED this 22nd day of September 2006. (Signed by Judge Robert W. Sweet on 9/22/06)(ja, ) Modified on 10/6/2006 (ja, ). (Entered: 09/25/2006) |
| 10/05/2006 | | MEMORANDUM TO THE DOCKET CLERK: as to Thomas Ware. Conference scheduled before the Court on 11/27/06 at 4:30 p.m. Parties are notified. Deft continued on bail as previously set. (bw, ) (Entered: 10/18/2006) |
| 10/05/2006 | | ORAL ORDER as to Thomas Ware. Status Conference set for 11/27/2006 04:30 PM before Judge Robert W. Sweet.(bw, ) (Entered: 10/18/2006) |
| 10/10/2006 | 20 | ENDORSED LETTER as to Thomas Ware addressed to Judge Sweet from David B. Levitt dated 9/25/06 re: Letter to amend the request in the 9/22/06 letter. Instead of a trial date, both counsel request that the date be set for a PTC in December 2006..So Ordered (Signed by Judge Robert W. Sweet on 10/6/06)(pr, ) (Entered: 10/11/2006) |
| 11/27/2006 | 21 | ENDORSED LETTER as to Thomas Ware addressed to Judge Sweet from Nicholas S. Goldin, AUSA dated 11/22/06 re: Adjournment of the 11/27/07 status conference until 1/3/07 @ 4:30PM. Exclusion of time for STA purposes from today until 1/3/07, on consent. So ordered (Signed by Judge Robert W. Sweet on 11/22/06)(pr, ) (Entered: 11/28/2006) |
| 11/27/2006 | | Set/Reset Hearings as to Thomas Ware: Status Conference set for 1/3/2007 04:30 PM before Judge Robert W. Sweet..(pr, ) (Entered: 11/28/2006) |
| 01/03/2007 | | Minute Entry for proceedings held before Judge Robert W. Sweet :Pretrial Conference as to Thomas Ware held on 1/3/2007, as to Thomas Ware; Jury Trial set for 6/4/2007 before Judge Robert W. Sweet. Parties present. Deft not present. Trial date scheduled for 6/4/07. Motion returnable on 4/18/07. Speedy Clock is stopped from 1/3/07 to 6/4/07. Deft cont'd on bail as set. (jw, ) (Entered: 01/09/2007) |
| 03/19/2007 | 22 | ENDORSED LETTER as to Thomas Ware from Edward T.M. Garland dated 3/12/07 re: Relieving Garland, Samuel & Loeb as counsel. So ordered.. (Signed by Judge Robert W. Sweet on 3/14/07)(pr) (Entered: 03/19/2007) |
| 03/19/2007 | | Attorney update in case as to Thomas Ware. Attorney Manubir S. Arora and Edward T.M. Garland terminated. (pr) (Entered: 03/19/2007) |

**18/28/2012**
4/16/2009 5:10 PM

| 04/17/2007 | 23 | NOTICE OF ATTORNEY APPEARANCE: Thomas Ware appearing for Thomas Ware. (pr) (Entered: 04/23/2007) |
|---|---|---|
| 05/14/2007 | | Minute Entry for proceedings held before Judge Robert W. Sweet :Pretrial Conference as to Thomas Ware held on 5/14/2007, as to Thomas Ware; Jury Trial set for 10/1/2007 before Judge Robert W. Sweet. Parties are present. Motion returnable 6/6/07. Motion returnable 9/19/07 for in-limine motion. Trial is adjourned from 6/4/07 to 10/1/07. Time is stopped 5/14/07 to 10/1/07. The Court permits Mr. Ware to represent himself/as counsel. The Court also appoints CJA Nancy Ennis as stand-by counsel to Mr. Ware. (jw) (Entered: 05/16/2007) |
| 05/15/2007 | 24 | ORDER as to Thomas Ware. The C.J.A. attorney assigned to receive cases on this day, 5/14/07, Nancy Ennis is hereby ordered to assume stand-by representation of the deft in the above captioned matter. (Signed by Judge Robert W. Sweet on 5/15/07)(bw) (Entered: 05/15/2007) |
| 05/15/2007 | 27 | CJA 20 as to Thomas Ware: Appointment of Attorney Nancy Lee Ennis for Thomas Ware. (Signed by Judge Robert W. Sweet on 5/21/07) CJA office mailed original to the attorney and sent a copy to the file.(sao) (Entered: 06/18/2007) |
| 06/11/2007 | 25 | ENDORSED LETTER as to Thomas Ware, addressed to Judge Sweet, from Thomas Ware, Atty for dft, dated 6/4/07, re: application for a one week extension of the time to file motions until 6/13/07. -- Judge endorsed: So ordered. Motions due by 6/13/2007. (Signed by Judge Robert W. Sweet on 6/7/07)(ja) (Entered: 06/12/2007) |
| 06/15/2007 | 26 | ORDER as to Thomas Ware. Pursuant to the S.D.N.Y. local rules, the Deft representing himself pro-se, the Clerk of the Court shall re-designate this case as non-ECF. It is so ordered. (Signed by Judge Robert W. Sweet on 6/12/07)(bw) (Entered: 06/18/2007) |
| 06/18/2007 | 28 | MEMORANDUM OF LAW in Support of Pretrial Motions (First Motion for Discovery) by Thomas Ware. (ja) (Entered: 06/19/2007) |
| 06/27/2007 | 29 | ORDER as to Thomas Ware. The motion of Deft Thomas Ware dated 6/12/07 will be heard on submission on 7/11/07. All motion papers shall be served in accordance with Local Criminal Rule 12.1. It is so ordered. (Signed by Judge Robert W. Sweet on 6/21/07)(bw) (Entered: 07/05/2007) |
| 07/13/2007 | 30 | ENDORSED LETTER as to Thomas Ware addressed to Judge Sweet from Nicholas S. Goldin dated 7/3/07 re: The Government respectfully requests until July 10, 2007 to file and serve its responsive papers..JUDGE MEMO-ENDORSEMENT...SO ORDERED. (Signed by Judge Robert W. Sweet on 7/10/07)(jw) (Entered: 07/16/2007) |
| 08/06/2007 | 31 | ENDORSED LETTER as to Thomas Ware, addressed to Judge Sweet, from Nicholas S. Goldin, AUSA, dated 7/24/07, re: request a one-month adjournment of the 10/1/07 trial date to accommodate the religious observance of certain Gov't witnesses. -- Judge endorsed: So ordered. (Signed by Judge Robert W. Sweet on 7/31/07)(ja) (Entered: 08/07/2007) |

| 08/10/2007 | 32 | MEMORANDUM OPINION AND ORDER # 95023 as to Thomas Ware. Defendant Thomas Ware has filed a motion seeking the following: 1) Dismissal of the Indictment for lack of proper venue in the SDNY; 2) Production of exculpatory material; 3) Notice of other act evidence the Gov't intends to introduce at trial under Fed. R. Evid. 404(b); 4) A bill of particulars; 5) Disclosure of ex parte communications between Judge Leonard B. Sand and the plaintiffs in the civil contract action underlying the pending criminal contempt charges;... 6) Disclosure of the name and contact information of the Gov't official who certified certain affidavits in the Civil Action; 7) Disclosure of the criminal history and plea agreement of "Edward M. Grushko; 8) Disclosure of the Indictments of "Thomas Badian" and "Andres Badian; and 9) Disclosure of the identity of the AUSA who presented the Indictment to the Grand Jury. For the reasons stated herein, the motion will be granted in part and denied in part.... Conclusion: the Defendant's motion will be granted to the following extent: the Gov't shall produce all exculpatory and impeachment evidence prior to trial and all Rule 404(b) evidence no later than the deadline for filing in limine motions. Defendant's motion is denied in all other respects. It is so ordered. (Signed by Judge Robert W. Sweet on 8/8/07)(ja) (Entered: 08/13/2007) |
| --- | --- | --- |
| 08/22/2007 | 33 | RESPONSE to the pretrial motions dated 6/12/2007 by dft Thomas Ware by USA as to Thomas Ware. (jar) (Entered: 08/22/2007) |
| 09/20/2007 | 34 | ENDORSED LETTER as to Thomas Ware addressed to Judge Sweet from Nicholas S. Goldin dated 9/18/07 re: Reschedule Trial., as to Thomas Ware; Jury Trial set for 10/29/2007 at 10:00 AM before Judge Robert W. Sweet..JUDGE MEMO-ENDORSEMENT...SO ORDERED. (Signed by Judge Robert W. Sweet on 9/18/07)(jw) (Entered: 09/21/2007) |
| 10/19/2007 | 38 | CJA 20 as to Thomas Ware: Appointment of Attorney James Roth for Thomas Ware. (Signed by Judge Robert W. Sweet on 10/19/07) CJA Office Mailed the Original to Attorney, and Sent Copy to File.(sac) (Entered: 10/25/2007) |
| 10/22/2007 | 35 | ORDER as to Thomas Ware. The CJA atty assigned to this case Nancy Lee Ennis is hereby ordered substituted and the representation of the deft in the above captioned matter is assigned to James Roth (Stand by Counsel). SO ORDERED. (Signed by Judge Robert W. Sweet on 10/19/07)(jw) (Entered: 10/23/2007) |
| 10/22/2007 | | Attorney update in case as to Thomas Ware. Attorney James Roth for Thomas Ware added. Attorney Nancy Lee Ennis terminated (jw) (Entered: 10/23/2007) |
| 10/22/2007 | 36 | ENDORSED LETTER as to Thomas Ware addressed to Judge Sweet from Attorney Nancy Lee Ennis dated 10/16/07 re: submitted to ask that the Court relieve her and replace her with an attorney who can serve as stand-by-counsel for the duration of the trial. ENDORSEMENT: Motion to relieve granted. Standby counsel to be appointed. (Signed by Judge Robert W. Sweet on 10/17/07)(bw) (Entered: 10/23/2007) |
| 10/22/2007 | 37 | ENDORSED LETTER as to Thomas Ware addressed to Judge Sweet from AUSAs Maria E. Douvas/Nicholas S. Goldin dated 10/16/07 re: submitted to |

## Ellen Yaroshefsky

Ellen Yaroshefsky is Clinical Professor of Law, Executive Director of the Jacob Burns Ethics Center and Co-Director the Intensive Trial Advocacy Program at Cardozo Law School in New York City. She teaches courses in professional responsibility and serves as an ethics consultant.

For more than twenty-five years Yaroshefsky worked as a criminal defense lawyer litigating civil rights, and criminal and international human rights cases. During her tenure as an attorney at the Center for Constitutional Rights in New York she litigated a wide range of cases. She is Of Counsel to Hinshaw and Culbertson handling matters involving the law of lawyering. She lectures frequently on ethics issues and is a member of numerous state and city committees and commissions.

www.cardozo.yu.edu

Back to main list

# Panelists Examine How Prosecutors Can Be Held Accountable for Misconduct

## By Helen W. Gunnarsson

CHICAGO—How much prosecutorial misconduct really exists? How effective are the systems being relied on to hold prosecutors accountable for misconduct, and what should be done to improve those systems?

A panel of experts hashed over these questions at a symposium on prosecutorial oversight presented here Aug. 4 by the National Organization of Bar Counsel and the Association of Professional Responsibility Lawyers in conjunction with the ABA Annual Meeting.

### High-Profile Cases

"It seems that virtually every week there's another case" of prosecutorial misconduct that gains national attention in the media, said professor Ellen Yaroshefsky of Benjamin N. Cardozo School of Law, New York.

As examples of highly publicized prosecutorial misconduct, Yaroshefsky cited the exonerations of Michael Morton in Texas and John Thompson in Louisiana, both of whom spent years in prison—Thompson on death row—as the result of prosecutors withholding exculpatory evidence (see Connick v. Thompson, 79 U.S.L.W. 4195, 27 Law. Man. Prof. Conduct 217
<http://lawyersmanual.bna.com/mopw2/display/link_res.adp?fedfid=27603172&fname=a0c7f3k4e2&vname=m opcnotallissues> (U.S. 2011)) and the suspensions of two prosecutors who concealed exculpatory evidence in criminal proceedings against Sen. Ted Stevens (R-Alaska) (see 28 Law. Man. Prof. Conduct 342
<http://lawyersmanual.bna.com/mopw2/display/link_res.adp?fedfid=27603172&fname=a0d2p1z8h5&vname= mopcnotallissues> ).

Yaroshefsky explained that by "prosecutorial misconduct" she did not mean conflicts of interest, negligence, or mere error. "People make errors all the time," she observed. Rather, she said, she and the other panel members were concerned with case-related, "intentional, significant acts of professional misconduct" that are "serious

and egregious."

Such misconduct, she said, consists primarily of prosecutors' intentional or reckless failure to disclose information, presentation of false testimony, and summations that "have gone over the line." Misconduct may occur, she said, because "legal, not ethical, judgments [increasingly] guide the conduct of prosecutors.... Once a prosecutor is convinced of a defendant's guilt, a [different] mentality takes over."

Yaroshefsky acknowledged up front that the collection of data on the issue has been less than satisfactory. Whether misconduct is "episodic," "endemic," or "systemic," she said, "we don't know." But regardless of existing studies' limitations, she said, "we do know that we have a serious problem."

But "I would hope that there are just a few prosecutors engaging in misconduct," she said. "We couldn't operate if there were massive prosecutorial misconduct."

## Call for More Discipline

Existing institutions do not adequately address the problem, she said, maintaining that internal controls in prosecutors' offices don't work as they should. "People are rarely fired," she said; instead, "what seems to happen is that when some prosecutors are brought before disciplinary committees, the prosecutor's office comes in and defends the prosecutor."

Nor are courts an adequate line of defense, Yaroshefsky said. "Judges rarely report misconduct, even though they are mandatory reporters." It's likewise rare, she said, for courts to impose sanctions on errant prosecutors. "Contempt is a complicated area of law for many judges."

Because current institutional mechanisms are not sufficient, Yaroshefsky urged, lawyer disciplinary agencies must step up to the plate. "We control the profession," she said. "Other measures for accountability don't exist."

Whatever the shortcomings of the current research, she said, it demonstrates beyond a reasonable doubt that "scholars have documented that there has not been discipline for prosecutors who have overstepped their bounds," Yaroshefsky said.

Pointing to the relatively few disciplinary charges brought against prosecutors, Yaroshefsky suggested that the power of many prosecutors' offices is "a big reason why most of these cases have not been prosecuted" by lawyer disciplinary agencies.

Furthermore, "most people in bar counsel offices have a similar mentality to prosecutors. There may be the tendency to look at the allegation and say, 'I understand why that occurred.' Conduct that from the outside is perceived as intentional is not perceived as intentional when looked at from the inside. We all have biases," she said.

To effectively address prosecutorial misconduct, bar disciplinary bodies must revamp their own mentality, procedures, staff, and structures, Yaroshefsky said. Offering some recommendations for change, she suggested "you need skilled criminal defense lawyers and prosecutors on your staff. Historically, in most offices, that has not been the case." She also urged that "independent counsel appointed by statute" should deal with charges of ethics rule violations by prosecutors.

Yaroshefsky advocated staffing disciplinary bodies not only with personnel "with extensive experience in the criminal justice system," but also "people who understand cognitive bias and the human tendency to push margins when there are not [adequate] controls in place."

## Higher Standards, Harsher Consequences

Panelist Maureen E. Mulvenna, Chicago, described her state's experience in handling disciplinary matters involving prosecutorial misconduct. Mulvenna is Director of Adjudication Services of the Illinois Attorney Registration and Disciplinary Commission.

Mulvenna said as she prepared for the joint program she wondered "Do adjudicators view prosecutors as the good guys on a white horse? Is there a sense that if they cross the line, the ends justify the means?" To answer those questions, Mulvenna said she interviewed individual members of Illinois's volunteer lawyer disciplinary hearing board panels and read as many opinions as she could find in cases nationwide involving prosecutorial misconduct.

Mulvenna cited In re Howes, 39 A.3d 1, 28 Law. Man. Prof. Conduct 157
<http://lawyersmanual.bna.com/mopw2/display/link_res.adp?fedfid=27603172&fname=a0d0v5f0v0&vname=mopcnotallissues> (D.C. 2012), in which a former assistant U.S. attorney was disbarred for supplying thousands of dollars in witness vouchers to ineligible persons in gang and drug prosecutions and concealing those payments from the defendants and the courts, as noteworthy for both its facts and its reasoning.

The hearing board opinion, she said, highlighted panel members' personal views of prosecutors. "One member wanted to recommend disbarment but didn't think he could because bar counsel hadn't recommended it."

Some members, she said, favored a one-year suspension, reasoning that the misuse of vouchers prevailed in the U.S. Attorney's Office and advanced what those members felt was a legitimate goal of law enforcement: bringing trials to a successful conclusion, or, in other words, getting convictions. "They relied on the fact that since the U.S. Attorney's Office didn't do anything about this policy, it wasn't a serious offense." For those adjudicators, Mulvenna said, a prosecutor's highest duty was to "make sure none of your witnesses get killed."

But the opinion of the D.C. Court of Appeals "hammered home" that "the unethical performance of prosecutorial duties has much more serious consequences" than when private counsel violate ethical rules, Mulvenna said.

She said that opinion, like the majority of those she read, expressed the view that prosecutors should be held to higher standards, and the penalty for their intentional misconduct made more severe, because of their important role within the justice system and the potential for harm to the public. Furthermore, she said, the court explicitly disavowed the view that prosecutorial ethical violations should be winked at as long as a transgressing prosecutor's goal was to amass convictions.

### Unconvinced of Problem

Panelist Melanie J. Lawrence, San Francisco, sounded a cautionary note. "After having read the data and research, I am still not convinced that there is a problem," Lawrence said. She is Assistant Chief Trial Counsel for the State Bar of California.

"The vast majority" of cases cited in existing reports on prosecutorial misconduct are "mistake, error, and instances in which prosecutorial misconduct was not found, although it may have been referenced." She urged the audience to "go and read the reports for yourself," commenting "we don't have a way of truly identifying whether or not this is a [serious and widespread] problem."

Bar prosecutors, Lawrence noted, generally rely on external sources to identify potential disciplinary matters. "Attorneys are required to report when there is a reversal based on prosecutorial misconduct. We rely on courts to report [to us] when such reversals are made. When we see instances in the paper we will look at them," she

said. "We can point to a number of sensational cases that make the front pages of newspapers. But from bar counsel's point of view, ... we are not going to prosecute unless we have evidence and proof."

## OPR's Approach

Panelist Lyn Hardy, assistant counsel in the Justice Department's Office of Professional Responsibility in Washington, D.C., explained that supervising federal government lawyers are required to make reports of misconduct to OPR.

To catch unreported misconduct, she said, OPR personnel review newspapers and Westlaw on a regular basis, using "a huge list of search terms," including "professional misconduct," "error," and "prosecutorial misconduct" to ferret out judicial findings and criticisms of Justice Department lawyers. "We go through and pull district court cases and appellate court cases that may not be referred to us."

In addition to the disclosure requirements set forth in Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States, 405 U.S. 150 (1972), the Jencks Act (18 U.S.C. §3500), and Fed. R. Crim. P. 16, Hardy noted that federal prosecutors must comply with DOJ internal rules and the policies set forth in the U.S. Attorneys' Manual (USAM).

"From bar counsel's point of view ... we are not going to prosecute unless we have evidence and proof."

Melanie J. Lawrence
California State Bar

In 2006, she said, the department revised Section 9-5.001 of the USAM to formalize DOJ policy that federal prosecutors must exceed their constitutional obligations in criminal cases and disclose information beyond that which is "material" to guilt, and further guidance was issued in 2010.

If OPR finds that a Justice Department lawyer has engaged in misconduct, Hardy said, it will impose discipline, including reprimand or suspension that will remain on the lawyer's record. If an ethics rule was implicated, she said, OPR will refer the matter to and cooperate with the lawyer's state bar disciplinary organization.

## Oversight Systems Aren't Working

Panelist Stephen Saloom, policy director for the Innocence Project in New York, reaffirmed Yaroshefsky's position, saying existing systems "are not working" and do not effectively address misconduct, he said.

Saloom said his organization has sponsored forums in several states titled "Prosecutorial Oversight: A National Dialogue in the Wake of Connick v. Thompson," aiming to learn how prosecutorial oversight systems work in individual jurisdictions.

"At these forums, we're finding that there is not consistent training of prosecutors regarding their ethical and legal obligations, there are rarely written expectations of prosecutorial behavior within offices, nor written or consistent responses to findings of misconduct," Saloom said.

Noting that prosecutors are entrusted with "immense power," Saloom said that "even when misconduct is found, it often doesn't make it to the bar disciplinary system." Individuals, whether fellow prosecutors, defense counsel, parties, or judges, "don't feel that they can report it, or they don't know how." And "lawyer oversight entities rarely address misconduct," he said.

For Saloom, the research does show that there's a serious problem. But, like other speakers, he said that data collection is inadequate to show the extent of the crisis. "Court findings of misconduct are probably just the tip of how many instances of misconduct there really are. A lot is probably never identified as problematic," even though "transgressions of ethical and legal boundaries" have occurred.

"Used improperly, power threatens justice," Saloom said. He called for "effective and respected leadership" on addressing prosecutorial misconduct. "The point is not to punish prosecutors. It's to ensure the propriety and quality of prosecutorial action and to ensure that it happens at all levels." He said "If [lawyer disciplinary] rules are not enforced, they provide [only] the illusion of oversight."

## Disclosure and Materiality

In response to an audience member's question about "materiality," Hardy stated that the Justice Department wants to ensure that the application of Model Rule 3.8(d)
<http://lawyersmanual.bna.com/mopw2/display/link_res.adp?fedfid=27603172&fname=aba_rules_3_8_d_&vn ame=mopcnotallissues> , which covers the disclosure obligations of prosecutors, is no broader than the constitutional and statutory requirements governing prosecutors.

But Yaroshefsky said prosecutors and ethics lawyers disagree on that point. Rule 3.8(d), she noted, requires prosecutors to disclose evidence tending to negate guilt or mitigate the offense. "It says nothing about 'materiality.' In cases post-Brady, courts have determined that cases will only be reversed if the evidence that was not disclosed was 'material,' so that it would have resulted in the reversal of a conviction. Prosecutors are now looking at evidence [in cases that are in progress] and saying, 'this is not 'material,' so I don't have to disclose,'" she said.

Yaroshefsky noted that ABA Formal Ethics Op. 09-454
<http://lawyersmanual.bna.com/mopw2/display/link_res.adp?fedfid=27603172&fname=aba_ethics_opinion_09 _454&vname=mopcnotallissues> , 25 Law. Man. Prof. Conduct 471
<http://lawyersmanual.bna.com/mopw2/display/link_res.adp?fedfid=27603172&fname=a0b9t6h3q9&vname= mopcnotallissues> (2009), advised that Model Rule 3.8(d)
<http://lawyersmanual.bna.com/mopw2/display/link_res.adp?fedfid=27603172&fname=aba_rules_3_8_d_&vn ame=mopcnotallissues> does not implicitly include the materiality limitation recognized in the constitutional case law.

"The rule requires prosecutors to disclose favorable evidence so that the defense can decide on its utility." Yaroshefsky said. "There is no consensus, whether state-by-state or otherwise. This is why bar counsel need experienced criminal practitioners who understand state [criminal] law."

## Obstruction Charges?

Yaroshefsky observed that prosecutors are seldom prosecuted for their misconduct. "Why aren't some of these cases criminal?" Some instances of prosecutorial misconduct, she asserted, may constitute obstruction of justice—a federal crime.

"People who steal money are dealt with. What about people who steal lives? When you're hiding evidence, you're stealing someone's life." She said "A few heads have to roll. That's the only thing that's going to make a difference."

P. 70

# USA Today Series on Federal Prosecutorial Misconduct

By Jeralyn, Section Misconduct
Posted on Thu Dec 09, 2010 at 08:13:17 PM EST
Tags: prosecutorial misconduct (all tags)
**Share This:** Digg! 💷■ 🥗 🖪 🖼

USA Today has a series, Justice in the Balance, exploring 201 cases of federal prosecutorial
misconduct.

A USA TODAY investigation has found that prosecutors have little reason to fear losing their
jobs, even if they violate laws or constitutional safeguards designed to ensure the justice system
is fair.

...The Justice Department consistently conceals its own investigations of misconduct from the
public. Officials say privacy laws prevent them from revealing any details of their investigations.
That secrecy, however, makes it almost impossible to assess the full extent and impact of
misconduct by prosecutors or the effectiveness of the department's attempts to deter it.

Today's installment reveals that prosecutors rarely lose their jobs even after they recklessly break
the rules. One example: the case of the wrongful charges brought against the parents of missing
baby Sabrina Aisenberg. AUSA Steven Kunz was admonished by the Florida bar (order here)
and removed from handling criminal cases in Tampa. [More...]

The government dropped its case against Sabrina's parents, and paid defense lawyers nearly $1.5
million. the largest such sanction ever imposed against the Justice Department for its
mishandling of a criminal case. And Kunz lost his position handling criminal cases for the U.S.
Attorney's Office here.

Kunz then got a job as an AUSA in Tallahassee where he is assigned to criminal cases.

The database of the 201 cases of misconduct is here. The Justice Department responds here.

### counterpoint (none / 0) (#1)

by diogenes on Fri Dec 10, 2010 at 08:44:20 AM EST
How many defense lawyers get disbarred if they "recklessly break the rules"? If state bar
associations are persecuting defense lawyers but not prosecutors, then maybe you have
something here.

### The Problem I Suspect is... (none / 0) (#2)

by ScottW714 on Fri Dec 10, 2010 at 03:04:25 PM EST
... once the misconduct has been revealed (in private), they worry that going public will
allow nearly all the people incarcerated by the prosecutor to get get another stab at the
apple.

Which makes sense, but can't we have some sort of Federal controls for spot checking complaints that would have some power, including license revocation. I would think the DOJ only steps in for very extreme instances.

I find it very troubling that the various bar associations, the AMA, and other legal licensing groups rarely revoke the license, even after the above, and with the AMA even after a doctor is found to have committed gross errors in judgment.

What's the point of the licensing associations if they don't monitor individuals who hold the license. Right know it would seem they main function is to administer the license testing and continuing education, which basically means once the license is obtained, you are free to screw up all day long and still remain licensed.

### **More information** (none / 0) (#3)

by jbindc on Fri Dec 10, 2010 at 03:47:11 PM EST

This is a serious issue when any lawyer - prosecutor or criminal defense attorney - makes a mistake or deliberately abuses the rules and someone loses their liberty who shouldn't, as well as the emotional and financial toll it takes on them and their family. Keeping in mind that no system is perfect, and there's no way to make it perfect, the legal profession should take every measure to police itself and more safeguards should be put in place to ensure the number of these types of cases remains small .

Looking at the link provided, USA Today found 201 cases over last 13 years out of hundreds of thousands of criminal cases filed in federal court in that same time period (USA Today says "tens of thousands", but considering there were 76,655 criminal cases filed in 2009 alone, it stands to reason that the number they should be comparing to is hundreds of thousands - the USA Today is either downplaying the numbers to make their analysis look better or they did sloppy reporting.

USA Today Series on Federal Prosecutorial Misconduct | **3** comments (3 topical)

# False Imprisonment

False imprisonment is the act of restraining a person against his/her will in a bounded area without any justification. False imprisonment generally refers to the confinement of a person without the consent of such person or without legal authority. For example, if a person wrongfully prevents another from leaving a room or vehicle when that person wants to leave, it amounts to false imprisonment.

In *Serra v. Lappin*, 600 F.3d 1191 (9th Cir. Cal. 2010), the court stated that false imprisonment is the non-consensual, intentional confinement of a person, without lawful privilege, for an appreciable length of time, however short.

It was found in *United States v. McMiller*, 2010 U.S. App. LEXIS 8093 (3d Cir. Pa. Apr. 19, 2010), that false imprisonment under Georgia law is a crime of violence since false imprisonment involves conduct that presents a serious potential risk of physical injury to another and therefore a Grade A violation under 18 USCS Appx § 7B1.1 of the United States Sentencing Guidelines.

Generally, false imprisonment is accompanied by force or threat of force, and a consent obtained by such force or threat of force is invalid. Some states still recognize false imprisonment as a misdemeanor at common law. False imprisonment is a common law misdemeanor and a tort. False imprisonment applies to both private and governmental detention. Few jurisdictions treat false imprisonment as kidnapping when the imprisonment is secret.

In *Ameen v. Merck & Co.*, 226 Fed. Appx. 363 (5th Cir. Tex. 2007), the court stated that a detention may be accomplished by violence, by threats, or by any other means that restrains a person from moving from one place to another. When a plaintiff alleges that the detention was accomplished by a threat, the plaintiff should demonstrate that the threat was such as would inspire in the threatened person a just fear of injury to his/her reputation, person, or property. The essential elements of false imprisonment are:

- Willful detention;

- Without consent; and

- Without authority of law.

In *Forgie-Buccioni v. Hannaford Bros., Inc.,* 413 F.3d 175 (1st Cir. N.H. 2005), the court found that under New Hampshire law, false imprisonment is the unlawful restraint of an individual's personal freedom. When a defendant acts with the intent to restrain or confine a plaintiff within boundaries fixed by the defendant, defendant's act directly or indirectly resulted in such restraint or confinement of the plaintiff, and the plaintiff was conscious of and harmed by the restraint or confinement, it constitutes a false imprisonment. Therefore, confinement can be imposed by physical barriers or physical force.

Some courts often use the term "false imprisonment" and "false arrest" interchangeably. Although the two terms are virtually identical, the difference lies in the manner in which they arise. For committing false imprisonment, intent to make an arrest or even making an arrest is not necessary. However, a falsely arrested person is at the same time falsely imprisoned.

In *Davis v. Clark County Bd. of Comm'ns*, 2009 U.S. Dist. LEXIS 123638, 8-9 (S.D. Ohio Nov. 16, 2009), the court noted that false arrest is a species of false imprisonment and therefore the two torts can be collectively referred to as "false imprisonment." False imprisonment consists of detention without legal process. Accordingly, false imprisonment ends once the victim becomes held pursuant to any process such as when s/he is bound over by a magistrate or arraigned on charges. The damages for a false arrest and/or false imprisonment claim commence at the time of detention and come to an end upon the issuance of process or arraignment.